IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDIANA PROTECTION | ) | |
| AND ADVOCACY SERVICES, | ) | |
| | ) | |
| Plaintiff | ) | CIVIL ACTION |
| v. | ) | NO. 1:06-cv-1816-JDT-TAB |
| | ) | |
| | ) | |
| | ) | |
| INDIANA FAMILY AND SOCIAL | ) | |
| SERVICES ADMINISTRATION, | ) | |
| MITCH ROOB, in his official capacity as | ) | |
| Secretary of the Family and Social Services | ) | |
| Administration; CATHY BOGGS, in her official | ) | |
| capacity as Director of the Division of Mental | ) | |
| Health and Addiction; LISA K. KELLUM, in her | ) | |
| official capacity as Superintendent of Larue | ) | |
| Memorial Hospital, | ) | |
| | ) | |
| Defendants | ) | |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS FOR
## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION
## FOR SUMMARY JUDGMENT

|  |  | Page |
|---|---|---|
| Introduction |  | 5 |
| Statement of Material Facts not in Dispute |  | 8 |
| Issues |  | 10 |
| Argument |  | 10 |
|  | Standard of Review in Summary Judgment | 10 |
| I. | Defendants violated the PAIMI Act by refusing to allow IPAS to have copies of Client 1's Larue Carter Hospital records. | 11 |
| II. | Defendants violated the PAIMI Act by refusing to allow IPAS to have copies of the Mortality Review Committee report and Root Cause Analysis report that arose from Client 1's death. | 18 |
| III. | Defendants violated the PAIMI Act by refusing to allow IPAS to have copies of the investigation and an incident report concerning the incidents in question and Client 2's grievance that arose out of those incidents. | 23 |
| Conclusions |  | 26 |

# TABLE OF AUTHORITY FOR
## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION
## FOR SUMMARY JUDGMENT

|  | Page |
|---|---|
| Fed.R.Civ.P. 56 | 5 |
| Fed.R.Cov.P. 56(c) | 11 |
| S.D.Ind.L.R. 56.1 | 5 |
| | |
| I.C. 12-7-2-184 | 12 |
| I.C. 12-24-1-3 | 12 |
| I.C. 12-28-1-1 *et seq.* | 6 |
| I.C. 16-39-2-6(a) | 7 |
| I.C. 16-39-2-6(a)(3) | 7 |
| I.C. 34-6-2-99 | 18 |
| I.C. 34-30-15-1, *et seq.* | 18, 19 |
| I.C. 34-30-15-1 | 18, 19 |
| I.C. 34-30-15-1(f) | 19 |
| | |
| 42 U.S.C.A. §10801et seq | 5 |
| 42 U.S.C.A. §10801(b)(2) | 6 |
| 42 U.S.C.A. § 10802(4) | 12, 13 |
| 42 U.S.C.A. § 10802(4)(A) | 14 |
| 42 U.S.C.A. § 10802(4)(B)(i)(I) | 14 |
| 42 U.S.C.A. § 10803 | 20 |
| 42 U.S.C.A. § 10804 | 12 |
| 42 U.S.C.A. § 10804(d) | 13, 14 |
| 42 U.S.C.A. § 10805(a) | 13 |
| 42 U.S.C.A. § 10805(a)(1) | 13 |
| 42 U.S.C.A. § 10805(a)(4) | 7, 12, 15, 16, 20 21, 22 |
| 42 U.S.C.A. § 10806(a) | 22 |
| 42 U.S.C.A. § 10806(b) | 22 |
| 42 U.S.C.A. § 10806(b)(3)(A) | 15, 20, 24, 25 |
| 42 U.S.C.A. § 10806(b)(2)(C) | 21 |
| 42 U.S.C.A. § 10807 | 5 |
| | |
| 42 C.F.R. § 51.2 | 12, 16 |
| 42 C.F.R. § 51.31(h) | 21, 25 |
| 42 C.F.R. § 51.7(a) | 14 |
| 42 C.F.R. § 51.41(a) | 16 |
| 42 C.F.R. § 51.41(b) | 7, 12 |
| 42 C.F.R. § 51.41(c) | 20, 25 |
| 42 C.F.R. § 51.41(c)(4) | 20 |
| 42 C.F.R. § 51.41(e) | 17 |

*Aldrich v. Randolph Cent. Sch. Dist.,*
963 F.2d 520, 523 (2d Cir. 1992)                                              11

*American Int'l Group, Inc. v. London Am. Int'l Corp.,*
664 F.2d 348, 351 (2d Cir. 1981)                                             11

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242, 248; 106 S.Ct. 2505; 91 L.Ed.2d 202 (1986)                     11

*Bryant v. Maffucci,*
923 F.2d 979, 982 (2d Cir. 1991)                                             11

*Celotex Corp. v. Catrett,*
477 U.S. 317, 323; 106 S.Ct. 2548; 91 L.Ed2d 265 (1986)                      11

*Center for Legal Advocacy v. Hammons,*
323 F.3d 1262 (10th Cir. 2003).                                             21

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837, 843-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)                 21

*Connecticut Office of Protection and Advocacy for Persons with*
*Disabilities v. Kirk*, 354 F.Supp.2d 196, 202 (Dist. Conn. 2005).          10, 21

*Heyman v. Commerce & Indus. Ins. Co.,*
524 F.d 1317, 1319-20 (2d Cir. 1975)                                         11

*Missouri Protection and Advocacy Services v. Missouri Department*
*of Mental Health,* 447 F.3d 1021 (8th Cir. May 10, 2006)                    21

*Pennsylvania Protection and Advocacy, Inc. v. Houstoun,*
228 F.3d 423 (3rd Cir. 2000)                                                20, 21

*Protection & Advocacy for Persons with Disabilities v.*
*Mental Health & Addiction Services*, 448 F.3d 119 (2d Cir. 2006)           21

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| INDIANA PROTECTION | ) | |
| AND ADVOCACY SERVICES, | ) | |
| | ) | |
| Plaintiff | ) | CIVIL ACTION |
| v. | ) | NO. 1:06-cv-1816-JDT-TAB |
| | ) | |
| | ) | |
| | ) | |
| INDIANA FAMILY AND SOCIAL | ) | |
| SERVICES ADMINISTRATION, | ) | |
| MITCH ROOB, in his official capacity as | ) | |
| Secretary of the Family and Social Services | ) | |
| Administration; CATHY BOGGS, in her official | ) | |
| capacity as Director of the Division of Mental | ) | |
| Health and Addiction; LISA K. KELLUM, in her | ) | |
| official capacity as Superintendent of Larue | ) | |
| Memorial Hospital, | ) | |
| | ) | |
| Defendants | ) | |

**BRIEF IN SUPPORT OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

Plaintiff, Indiana Protection and Advocacy Services ("IPAS"), by counsel, pursuant to

Fed.R.Civ.P. 56 and S.D.Ind.L.R. 56.1, respectfully submits this brief in support of Plaintiff's

Motion for Summary Judgment, which is filed contemporaneously herein.

**INTRODUCTION**

Indiana Protection and Advocacy Services seeks injunctive and declaratory relief

pursuant to 42 U.S.C.A. § 10807 to prevent Defendants from restricting access to the records of

individuals with mental illness from Larue Carter Memorial Hospital ("Larue"). Such access is

mandated by the Protection and Advocacy for Mentally Ill Individuals Act ("PAIMI Act"), 42

U.S.C.A. §10801 *et seq.,* and other applicable federal and state laws.

5

The Protection and Advocacy for Individuals with Mental Illness Act of 1986 ("PAIMI") was enacted to establish independent  protection and advocacy systems  ("P&A") nationwide with authority to protect and advocate for the rights of individuals with mental illness "through activities to ensure the enforcement of the Constitution and Federal and State statutes" and by investigating "incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." 42 U.S.C.A. §10801(b)(2)(A) and (B).  Congress gave P&As broad authority to access all records of individuals with mental illness in order to accomplish this aim.

Indiana Protection and Advocacy Services ("IPAS") was established by the State of Indiana to administer and operate, among other federal programs, the PAIMI program.  I.C. 12-28-1-1 *et seq.*  As such, it is the eligible system in the State of Indiana mandated to provide protection and advocacy for persons with mental illness under the PAIMI Act.  The PAIMI Act allows the system, in this case IPAS, access in the following circumstances:

1.     The P&A access has been authorized by an individual who is a client of the P&A system or the legal guardian, conservator, or other legal representative; or

2.      An individual, including an individual who has died or whose whereabouts or unknown, (1) who by reason of the mental or physical condition of such individual is unable to authorize the system to have such access; (2) does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and (3) with respect to whom a complaint has been received by the system or there is probable cause to believe that such individual has been subject to abuse or neglect; or

3.     An individual with a mental illness, who has a legal guardian, conservator, or other legal representative, with respect to whom a complaint has been received by the system or with

respect to whom there is probable cause to believe the health and safety of the individual

is in serious and immediate jeopardy, whenever (1) such representative has been

contacted by such system upon receipt of the name and address of such representative;

(2) such system has offered assistance to such representative to resolve the situation; and

(3) such representative has failed or refused to act on behalf of the individual;

42 U.S.C.A. § 10805(a)(4); 42 C.F.R. § 51.41(b).

Further, in creating this system, the State of Indiana also provided IPAS with broad access

authority to the records of individual's with mental illness, to the extent that IPAS can access

mental health records without the consent of the individual.[1]   I.C. 16-39-2-6(a)(3).

In the case of both Client 1 and Client 2, IPAS received a report that gave IPAS probable

cause to begin an investigation.  Client 1 was deceased, and at the time of her death, had no legal

guardian, conservator, or legal representative.  Despite clear authority to access records, and after

the IPAS Advocate had accessed the records while at Larue on two occasions, Larue refused to

allow IPAS to have copies of Client 1's file in violation of the PAIMI Act.  When IPAS

requested copies of the Mortality Review report and the Root Cause analysis report arising from

Client 1's death, Larue further violated the PAIMI Act when IPAS was refused access to and

copies of the reports.  Finally, Larue refused to give IPAS a copy of an Incident Report arising

from Client 2's complaint, another violation of the PAIMI Act.   IPAS has initiated this action to

redress Larue's continued refusal to provide access to the records clearly within the purview of

the PAIMI Act and that are needed to carry out IPAS's mandate to investigate suspected

---

[1] I.C. 16-39-2-6 states:
      (a) Without the consent of the patient, the patient's mental health record may only be disclosed as follows:
                …
          (3) To the patient's court appointed counsel and to the Indiana protection and advocacy
             services commission.

incidents of abuse or neglect.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.  J.Y.G ("Client 1"), who has the Larue Carter Patient Case #: 17455, was admitted to Larue Carter Hospital on June 21, 2006.  (Stip. ¶ 1, App. 1).

2.  Client 1 was admitted to Wishard Memorial Hospital from Larue Carter Hospital on June 27, 2006.  (Stip. ¶ 2, App. 1).

3.  Client 1 died on July 31, 2006 at Wishard Hospital.  (Stip. ¶ 3, App. 1).

4.  A Mortality Review committee at Larue Carter Hospital met on August 11, 2006 and its report was transcribed on August 28, 2006.  (Stip ¶ 4, App. 1)

5.  On or about August 30, 2006, Peggy Owens ("Owens"), Advocate at Indiana Protection and Advocacy Services, accessed Client 1's record while at Larue.  She once again accessed the record on or about September 1, 2006.  (Owen's Aff. ¶ 4, ¶ 7, App. 5).

6.  On or about August 30, 2006, Owens requested a copy of Client 1's complete chart held at Larue.  This request was made by a letter to Jay Wenning, Director of Health Information Services at Larue Carter Hospital.  The letter stated that if IPAS did not receive a copy of the chart or there was no response by September 11, 2006, IPAS would assume that Larue did not intend to comply with the request.  (Stip. ¶ 5, App. 2; Owens Aff. ¶ 3, App. 3-4; Owens Aff. Attach. A, App. 7-8).

7.  On or about September 1, 2006, IPAS was notified through an e-mail sent by Kathy Gregory, Deputy Chief Counsel of Division of Mental Health and Addiction ("DMA"), that Client 1 had parents who had been active in her case and had not signed a release of her medical record as next of kin.  There is no record that prior to her death, Client 1 had a court appointed guardian,

power of attorney, or health care representative.  (Stip. ¶ 6, App. 2; Owens Aff. ¶ 5, App. 5;

Owens Aff. Attach. B, App. 9-10).

8.  On or about September 13, 2006, Owens sent a second letter to Jay Wenning requesting a

copy of the Mortality Review Committee report and Root Cause Analysis report that resulted

from death of Client 1.  This letter stated that if IPAS did not receive the copies of the reports or

there was no response by September 19, 2006, IPAS would assume that Larue did not intend to

comply with the letter.  (Stip. ¶ 7, App.2; Owens Aff. ¶ 6, App. 5; Owens Aff. Attach. C, App.

11).

9.  On or about September 14, 2006, IPAS was notified by e-mail from Kathy Gregory that IPAS

would not be given copies of the requested reports concerning Client 1's death.  (Stip. ¶ 8, App.

2; Owens Aff. ¶ 8, App. 5; Owens Aff. Attach. B, App. 9-10).

10.  J.F. ("Client 2"), who has the Larue Carter Patient Case #: 17127, was initially admitted to

Larue Carter Hospital in November 2003.  He was residing on Unit 3A in November of 2006.

He continues to be a resident of Larue Carter Hospital.  (Stip. ¶ 9, App. 2).

11.  Client 2 signed a release of information authorizing Owens to have access to his records

from Larue.  (Owens Aff. ¶ 9, App. 5; Owens Aff. Attach. D, App. 12).

12.  On or about October 13, 2006, Owens requested by e-mail to Eric Heeter, Adult Services

Division Director at Larue, a copy of the investigation and an incident report concerning the

incidents in question and Client 2's grievance that arose out of those incidents.  Owens asked to

be notified via e-mail by end of business day October 17, 2006.  (Stip. ¶ 10, App. 2-3; Owens

Aff. ¶ 10, App. 5-6; Owens Aff. Attach. E and F, App 13-17).

13.  On or about October 13, 2006, Mr. Heeter explained in an e-mail that he could not provide a

copy of the incident report "per organization policy".  (Owens Aff. ¶ 11, App 6; Owens Aff.

Attach. E, App. 13-14).  In a separate e-mail dated October 18, 2006, Mr. Heeter replied to

Owens by e-mail explaining the sequence of events and Larue's response.  (Owens Aff. ¶ 12,

App. 6; Owens Aff. Attach. F, App. 15-17).

14.  Also on or about October 18, 2006, Owens received an e-mail from Kellum stating that it

was not appropriate to ask for a copy of the Incident Reports.  (Stip, ¶ 11, App. 3; Owens Aff. ¶

11, ¶ 12, ¶ 13, App. 6; Owens Aff. Attach. E and F, App. 13-17)

## ISSUES

Issues before the Court are as follows:

1.  Did Defendants violate the PAIMI Act by refusing to allow IPAS to have copies
of Client 1's Larue Carter Hospital records?

2.   Did Defendants violate the PAIMI Act by refusing to allow IPAS access to and
copies of the Mortality Review Committee report and Root Cause Analysis report
that arose from Client 1's death?

3.  Did Defendants violate the PAIMI Act by refusing to allow IPAS to have copies
of the investigation and an incident report concerning the incidents in question
and Client 2's grievance that arose out of those incidents?

## ARGUMENT

The Court in *Connecticut Office of Protection and Advocacy for Persons with Disabilities

v. Kirk*[2] succinctly sets out the standard for summary judgment:

A motion for summary judgment may be granted "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is

---

[2] 354 F.Supp.2d 196, 202 (Dist. Conn. 2005).

no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Cov.P. 56(c).  Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323; 106 S.Ct. 2548; 91 L.Ed2d 265 (1986).  "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.' " *American Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir. 1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.,* 524 F.d 1317, 1319-20 (2d Cir. 1975)).  A dispute concerning a material fact is genuine " 'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248; 106 S.Ct. 2505; 91 L.Ed.2d 202 (1986)).  The court must view all inferences and ambiguities in a light most favorable to the nonmoving party.  *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

I.     **Defendants violated the PAIMI Act by refusing to allow IPAS to have copies of Client 1's Larue Carter Hospital records.**

Client 1 was admitted to Larue Carter Hospital on June 21, 2006, transferred and admitted to Wishard Memorial Hospital on June 27, 2006, and died at Wishard Hospital on July 31, 2006. (Stip. ¶ 1, ¶ 2, ¶ 3, App. 1).  On or about July 31, 2006, Indiana Protection and Advocacy received a report from a professional staff at Larue Carter Hospital that Client 1 had expired. (Owens Aff. ¶ 2, App. 4).  As the circumstances raised questions of possible neglect, IPAS decided they had probable cause to investigate the death and opened a case.[3]

---

[3] The term "neglect" means a negligent act or omission by any individual responsible for providing services in a facility rendering care or treatment which caused or may have caused injury or death to a[n] individual with mental

Larue is a state institution as defined in I.C. 12-7-2-184 and is administered by the Division of Mental Health and Addiction. I.C. 12-24-1-3. It provides overnight care and treatment to individuals with mental illness. Under the PAIMI Act, a facility includes any public or private residential setting that provides overnight care accompanied by treatment services. Facilities include, but are not limited to the following: general and psychiatric hospitals, nursing homes, board and care homes, community housing, juvenile detention facilities, homeless shelters, and jails and prisons, including all general areas as well as special mental health or forensic units. 42 C.F.R. § 51.2. Larue is a facility for the purposes of the PAIMI Act. The PAIMI Act mandates that IPAS have access to the records maintained by a covered facility of an individual with mental illness, when certain conditions are met.[4]

An eligible system under the PAIMI Act provides services to individuals with a mental illness.[5] This includes an individual who has a significant mental illness or emotional impairment and who lives in a community setting. 42 U.S.C.A. § 10802(4). However, the

---

illness or which placed a[n] individual at risk of injury or death, and includes an act or omission such as the failure to establish or carry out appropriate individual program plan or treatment plan for a[n] individual with mental illness, the failure to provide adequate nutrition, clothing, or health care to a[n] individual with mental illness, or the failure to provide a safe environment for a[n] individual with mental illness, including the failure to maintain adequate numbers of appropriately trained staff. 42 U.S.C.A. § 10804

[4] See 42 U.S.C.A. § 10805(a)(4); 42 C.F.R. § 51.41(b)

[5] 42 U.S.C.A. § 10802(4) provides:
The term "individual with mental illness" means, except as provided in section 10804(d) of this title, an individual—
    (A)    who has a significant mental illness or emotional impairment, as determined by a mental health professional qualified under the laws and regulations of the State; and
    (B)(i)
        (I)    who is an inpatient or resident in a facility rendering care or treatment, even if the whereabouts of such inpatient or resident are unknown;
        (II)    who is in the process of being admitted to a facility rendering care or treatment, including persons being transported to such a facility; or
        (III) who is involuntarily confined in a municipal detention facility for reasons other than serving a sentence resulting from conviction for a criminal offense; or
    (ii)  who satisfies the requirements of subparagraph (A) and lives in the community setting, including their own home.

PAIMI Act does place limits on the use of PAIMI allotments for representation to individuals with mental illness who live in the community.[6]  An eligible system may only use PAIMI allotments for these individuals if the total allotment for any fiscal year is $30,000,000 (thirty million) or more.  42.U.S.C.A. § 10804(d).  Even when this criteria is met, eligible systems must give priority to the representation of individuals with mental illness who reside in a facility rendering care or treatment, are in the process of being transported to such a facility, or who are involuntarily confined in a municipal detention facility for reasons other than serving a sentence resulting from conviction for a criminal offense.  This representation is further limited to individuals with mental illness who are residents of the State, but only with respect to matters which occur within ninety (90) days after the date of the discharge of such individuals from a facility providing care or treatment.[7]  42 U.S.C.A. § 10805(a)(1).  Therefore, IPAS may use its PAIMI allotments to provide protection and advocacy services for: (1) individuals with mental illness as defined in 42 U.S.C.A. § 10802(4) and 10805(a), including persons who report matters which occurred while they were individuals with mental illness; and (2) individuals with mental illness who are residents of the State, but only with respect to matters which occur within ninety

---

[6] 42.U.S.C.A. § 10804(d) provides that the definition of  "individual with a mental illness" contained in section 10802(4)(B)(iii) of this title shall apply, and thus an eligible system may use its allotment under this subchapter to provide representation to such individuals, only if the total allotment under this subchapter for any fiscal year is $30,000,000 or more, and in such case, an eligible system must give priority to representing persons with mental illness as defined in subparagraphs (A) and (B)(i) of section 10804(4) of this title."

[7] 42 U.S.C.A. § 10805(a)(1) provides:
   A system established in a State under section 10803 of this title to protect and advocate the rights of individuals with mental illness shall—
   (1)      have the authority to—
            (A) investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or there is probable cause to believe that the incidents occurred;
            (B) pursue administrative, legal, and other appropriate remedies to ensure the protection of individuals with mental illness who are receiving care or treatment in the State; and
            (C) pursue administrative, legal, and other remedies on behalf of an individual who—
                     (i)      was a individual with mental illness; and
                     (ii)     is a resident of the State,
   but only with respect to matters which occur within 90 days after the date of the discharge of such individual from a facility providing care or treatment.

(90) days after the date of the discharge of such individuals from a facility providing care or treatment.  42 C.F.R. § 51.7(a).

Client 1 was a resident at Larue, a state institution under the auspices of the Division of Mental Health and Addiction and a facility under the PAIMI Act, from June 21, 2006 to June 27, 2006. (Stip. ¶ 1, App. 1).  Client 1 died on July 31, 2006 at Wishard Hospital.  (Stip. ¶ 3, App. 1). As defined by 42 U.S.C.A. § 10802(4)(A) and (B)(ii) and 42 U.S.C.A. § 10804(d), Client 1 was a person with a mental illness.  She had a mental illness significant enough that she was civilly committed to Larue.  She was an individual who was residing in the community at the time of the pivotal event.  The pivotal event, her death, occurred three days after her discharge from Larue, which satisfies the criteria that the matter occurs within ninety (90) days of discharge.[8] Because Client 1 lived in the community at the time of her death, IPAS could only serve her if the overall allotment for the PAIMI system in 2006 reached $30,000,000 (thirty million) or more.  42.U.S.C.A. § 10804(d).   Per the attachment to the affidavit of David Boes, the PAIMI Program Coordinator for IPAS, the total PAIMI appropriation for the year 2006 was $34,000,000 (thirty four million).  (Attachment to Boes Aff., App. 30). As all statutory criterion have been met, Client 1 is eligible for PAIMI services and is a client of IPAS.

The PAIMI Act mandates that a system established under section 10803 of the Act shall have access to all records of:

> (A) any individual who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access;
>
> (B) any individual (including an individual who has died or whose whereabouts or unknown)—
>
> > (i) who by reason of the mental or physical condition of such individual is

---

[8] Death does not negate an individual's eligibility under the PAIMI Act, as an eligible system is charged with investigating deaths when there is a complaint or probable cause that the death involved abuse or neglect.

unable to authorize the system to have such access;

(ii) who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and

(iii) with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities (either of which result from a complaint or other evidence) there is probable cause to believe that such individual has been subject to abuse or neglect; and

(C) any individual with a mental illness, who has a legal guardian, conservator, or other legal representative, with respect to whom a complaint has been received by the system or with respect to whom there is probable cause to believe the health and safety of the individual is in serious and immediate jeopardy, whenever—

(i) such representative has been contacted by such system upon receipt of the name and address of such representative;

(ii) such system has offered assistance to such representative to resolve the situation; and

(iii) such representative has failed or refused to act on behalf of the individual;

42 U.S.C.A. § 10805(a)(4)[9]

There is no record that prior to her death, Client 1 had a court appointed guardian, power of attorney, or health care representative. (Stip. ¶ 6, App. 2).  The only mention that anyone might be a legal guardian, conservator, or legal representative came in the e-mail from Kathy Gregory, Deputy Chief Counsel of Division of Mental Health and Addiction, sent September 1, 2006.  She states "[i]f Peggy [Owens] has read the record, which I understand she has, then she is aware that the deceased individual had parents who have been active in the case." (Owens Aff.

---

[9] Pursuant to 42 U.S.C.A. § 10806(b)(3)(A), records are defined as follows:

    As used in this section, the term "records" includes reports prepared by any staff of a facility rendering care and treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility that describe incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents, and discharge planning records.

¶ 5, Aff. 5; Owens Aff. Attach. B, Aff. 9-10).  The definition of legal representative under the

PAIMI Act is as follows:

> Legal Guardian, Conservator, and Legal Representative all mean an
> individual whose appointment is made and regularly reviewed by a State
> court or agency empowered under State law to appoint and review such
> officers, and having authority to consent to health/mental health care or
> treatment of an individual with mental illness.  It does not include persons
> acting only as a representative payee, persons acting only to handle financial
> payments, attorneys or persons acting on behalf of an individual with mental
> illness only in individual legal matters, or officials responsible for the provision
> of health or mental health services to an individual with mental illness, or their
> designees.
> 42 C.F.R. § 51.2.

Just as there are numerous definitions of "individuals with disabilities" or "discrimination" under

state and federal laws, there are varying definitions for a Legal Guardian, Conservator, or Legal

Representative.  The controlling definition in the instance is the one set forth in 42 C.F.R. § 51.2.

The fact that the parents were active in Client's life prior to her death does not qualify them as a

legal guardian, conservator, or legal representative for the purposes of the PAIMI Act and more

specifically, for the need to gain consent for IPAS to access the records.

In this instance, IPAS has the authority to access Client 1's records pursuant to 42

U.S.C.A. § 10805(a)(4).  Client 1 is an individual with a mental illness who by reason of her

mental or physical condition, in this case death, was unable to authorize the system to have

access.  Client 1 has no legal guardian, conservator, or other legal representative as defined by

the PAIMI Act.  IPAS received a report from a Larue staff member of Client's death which

indicated there was probable cause to believe that Client 1 has been subject to abuse or neglect.

42 C.F.R. § 51.41(a) provides that "access to records shall be extended promptly to all

authorized agents of a P&A."  Owens is an authorized agent of IPAS.  Further, the PAIMI

regulations state a P&A system shall be permitted to inspect and copy records, subject to a reasonable charge to offset duplicating costs. 42 C.F.R. § 51.41(e).

So, in a death investigation that was initiated by IPAS from a report from a Larue staff member, Owens was allowed access to Client 1's records **twice** while conducting the investigation, but was denied when she asked for copies of the same record because she did not have access authority. In a mind boggling twist of logic, it seems Defendants agree that IPAS has access authority to **look** at a Larue patient's file, but IPAS does not have access authority to have a **copy** of the same file.

Every criterion that must be met for IPAS to have access to Client 1's record, including copies, has been met. Larue is a facility under the PAIMI Act. IPAS is the eligible system under the PAIMI Act and under Indiana State Statute. Client 1 is an individual with a mental illness who lived in the community. The total allocation for the nation wide PAIMI program in 2006 exceeded thirty million dollars. The pivotal event, death, occurred within ninety (90) days of client's discharge from Larue. Client 1 could not consent to IPAS' access to her records, because she had died by the time IPAS became involved. Client 1 had no legal guardian, conservator, or legal representative as defined by the PAIMI Act. IPAS received a report about Client 1's death from a staff member at Larue and believed there was probable cause to open an investigation. Larue allowed the IPAS Advocate access to Client 1's records on two separate occasions. Count 1 exists because Larue denied copies of a record IPAS had already accessed twice.

This denial of copies of the record could not be a more obvious violation of PAIMI's access authorization. As a result, an investigation into possible abuse or neglect has been impeded and IPAS's basic mandate to protect Indiana individuals with mental illness who may

have been the subject of abuse or neglect obstructed.  IPAS would ask that the Court order Larue to provide IPAS with the requested copies of Client 1's file and enjoin Larue from further actions which deny IPAS the access authorized under both the PAIMI Act and Indiana statute.

**II.      Defendants violated the PAIMI Act by refusing to allow IPAS to have copies of the**

            **Mortality Review Committee report and Root Cause Analysis report that arose**

            **from Client 1's death.**

Even where P&A systems and facilities have agreed with most aspects of a P&A's access authority, there remains the on-going debate of a P&A's access to records generated during and resulting from the peer review process.  In Indiana, peer review committees have the responsibility of evaluating:  (A) qualifications of professional health care providers; (B) patient care rendered by professional health care providers; or (C) the merits of a complaint against a professional health care provider.  I.C. 34-6-2-99.  In general, these committees are tasked with assessing  errors in a system and making recommendations on corrective actions and overall improvements.  The purpose of the peer review process is to foster full disclosure which will lead to a candid evaluation of the system.  Many state laws have imposed strict confidentiality and disclosure restrictions.  These statutory restrictions are generally enacted to protect peer review records from discovery or from being introduced into evidence in the course of a civil damage action.

Indiana peer review statutes are found at I.C. 34-30-15-1, *et seq.*

I.C. 34-30-15-1 states:

      (a)  All proceedings of a peer review committee are confidential.
      (b)  All communications to a peer review committee shall be privileged
           communications.
      (c)  Neither the personnel of a peer review committee nor any participant in a
           committee proceeding shall reveal any contents of:
              (1) communications to;

> (2) the records of; or
> (3) the determination of:
> a peer review committee outside of the peer review committee.

But I.C. 34-30-15-1 also states:

> (f) Upon its determination, the governing body of a hospital may report, as part of
> the hospital's quality assessment and improvement program, a determination of a
> peer review committee of the hospital regarding an adverse event concerning
> patient care to the state department of health or another state agency without:
> > (1)  violating this section; or
> > (2)  waiving the confidentiality and privilege attached to the
> > communications, proceedings, records, determinations, or
> > deliberations of the peer review committee.

IPAS is a state agency established by I.C. 12-28-1-1, *et seq.*  In this instance, IPAS requested the

Mortality report and Risk Analysis report relating to Client 1's death.  It is IPAS' understanding

that both reports are generated at the end of the peer review process, thus enumerating the

conclusions and determinations of the committee.  While I.C. 34-30-15-1(f) does not mandate

that Defendants provide access to and copies of the requested reports, it certainly does not

prohibit IPAS' access and allows Defendants the option of releasing the reports to IPAS without

violating the section or waiving confidentiality or privilege of this peer review process.  Access

to such reports are not only crucial in a P&A's investigation of the specific event that triggered

the peer review process and the P&A investigation, it provides essential information on possible

systemic issues not available from any other source.  Allowing IPAS access to the Mortality

Review reports and other peer review reports does not violate the state peer review statutes and

can assist the State in determining whether the peer review system itself is serving its function.

        However, should this Court decide that I.C. 34-30-15-1 does not permit IPAS access to

the requested reports, IPAS asserts that P&As nonetheless have access to such reports, despite

the restrictions of a State statute.  The PAIMI statutes are unambiguous in the definition of

"records".  That definition includes "reports prepared by any staff of a facility rendering care and

treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility that describe incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents." 42 U.S.C.A. § 10806(b)(3)(A). Moreover, it is also unambiguous in delineating the extent of a P&A's access to those records. 42 U.S.C.A. § 10805(a)(4) mandates that a "system established under section 10803 of the Act **shall** have access to **all** records." [emphasis added]. Peer review reports fall squarely within the scope of the access provisions under the PAIMI Act.

Some health care providers have argued that based on PAIMI regulation 42 C.F.R. § 51.41(c)(4)[10] and legislative history arising from the re-authorization of the PAIMI Act in 1991,[11] P&A systems do not have access to peer review reports when a State statute prohibits such access. Courts have rejected this argument. The Third Circuit ruled that P&A organizations have access to peer review reports regardless of state law. *Pennsylvania Protection and Advocacy, Inc. v. Houstoun*, 228 F.3d 423 (3rd Cir. 2000). Further, it held that the interpretation of PAMII[12] set out in 42 C.F.R. § 51.41(c)(4) does not represent a reasonable

---

[10] 42 C.F.R. § 51.41(c) Information and individual records, whether written or in another medium, draft or final, including hand written notes, electronic files, photographs or video or audio tape records, which shall be available to the P&A system under the Act shall include, but not be limited to:

…

    (4) Reports prepared by individuals and entities performing certification or licensure reviews, or by professional accreditation organizations, as well as related assessments prepared for the facility by its staff, contractors or related entities, **except that nothing is this section is intended to preempt State law protecting records produced by medical care evaluation or peer review committees.** [emphasis added]

[11] The House Report issued at the time of the re-authorization of the PAIMI Act by the Protection and Advocacy for Mentally Ill Individuals Amendment Act of 1991 stated "[i]t is the Committee's intent that the PAIMI Act does not preempt State law regarding disclosure of peer review/medical review records relating to the proceedings of such committees." H.R.Rep. No. 102-319, *reprinted in* 1991 U.S.C.C.A.N. 777, 782

[12] For the purposes of this decision, the Protection and Advocacy for Mentally Ill Individuals Act was designated as "PAMII" instead of the usual "PAIMI". *Pennsylvania Protection and Advocacy, Inc. v. Houstoun*, 228 F.3d 423 (3rd Cir. 2000).

interpretation of the statute, and we must therefore reject it." *Id.*[13]  The Second, Eighth, and Tenth Courts have joined the Third Circuit in upholding a P&A's authority to access records protected from disclosure pursuant to state peer review confidentiality statutes.  *Protection & Advocacy for Persons with Disabilities v. Mental Health & Addiction Services*, 448 F.3d 119 (2d Cir. 2006), *Missouri Protection and Advocacy Services v. Missouri Department of Mental Health*, 447 F.3d 1021 (8th Cir. May 10, 2006), *Center for Legal Advocacy v. Hammons*, 323 F.3d 1262 (10th Cir. 2003).  Under the PAIMI Act, a P&A's authority to access records as provided in the Act expressly preempts any contrary state laws by virtue of the Supremacy Clause of the United States Constitution.  *Connecticut Office of Protection and Advocacy for Persons with Disabilities v. Kirk*, 354 F.Supp.2d 196, 202 (Dist. Conn. 2005).  The PAIMI statute clearly states:

> If the laws of a State prohibit an eligible system from obtaining access
> to records of individuals with mental illness in accordance with section
> 10805(a)(4) of this title and this section, section 10805(a)(4) of this title
> and this section shall not apply to such system before—
>> (i)      the date such system is no longer subject to such a prohibition; or
>> (ii)      the expiration of the 2-year period beginning on May 23, 1986,
> whichever occurs first.

42 U.S.C.A. § 10806(b)(2)(C).

Being that it is 2007 and more than 21 years after the expiration of the 2-year period, the federal scheme applies regardless of the state law restricting access. *Id.*   Further, 42 C.F.R. § 51.31(h) provides that a "P&A system may exercise its authority under State law where the authority exceeds the authority required by the Act.  However, State law must not diminish the required authority of the Act."

     IPAS agrees that for a peer review process to be open and truthful, it must be shielded against disclosure for the purposes of liability in a civil action.  Defendants seem concerned that

---

[13] Referencing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843-44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

IPAS would turn over peer review documents to their clients or those representing their clients to the detriment of the Defendants. Specifically, in her e-mail from September 14, 2006, Kathy Gregory expressed concerns that IPAS might disclose peer review records to their clients, who would in turn, disclose the records to personal injury lawyers. (Owens Aff. Attach. B, Aff. 9-10). Such concerns are completely unfounded. 42 U.S.C.A. § 10806(a) states: "An eligible system which, pursuant to section 10805(a)(4) of this title, has access to records which, under Federal or State law, are required to be maintained in a confidential manner by a provider of mental health services, shall, except as provided in subsection (b) of this section, maintain the confidentiality of such records to the same extent as is required of the provider of such services." The Act also addresses P&A disclosure responsibility. 42 U.S.C.A. § 10806(b) provides:

(1)     Except as provided in paragraph (2), an eligible system which has access to records pursuant to section 10805(a)(4) of this title may not disclose information from such records to the individual who is the subject of the information, if the mental health professional responsible for supervising the provision of mental health services to such individual has provided the system with a written determination that disclosure of such information to such individual would be detrimental to such individual's health.

(2) (A) If disclosure of information has been denied under paragraph (1) to an individual—

        (i)     such individual;

        (ii)    the legal guardian, conservator, or other legal representative of such individual; or

        (iii)   an eligible system, acting on behalf of an individual described in subparagraph (B),

may select another mental health professional to review such information and to determine if disclosure of such information would be detrimental to such individual's health. If such mental health professional determines, based on professional judgment, that disclosure of such information would not be detrimental to the health of such individual, the system may disclose such information to such individual.

IPAS is bound by the State's confidentiality and disclosure restrictions on peer review records to the same extent as Defendants. IPAS cannot turn over peer review reports to its clients. It is

prohibited by the PAIMI statutes, which require that the IPAS standard of confidentiality and disclosure mirror the States on peer review reports. The restrictions sought by Defendants serve no purpose but to undermine the P&A's statutory authority to effectively and promptly investigate suspected incidents of abuse and neglect, while such interference is unnecessary to uphold the purpose of the State's peer review confidentiality statutes.

IPAS would ask that the Court order Larue to provide IPAS with the requested copies of the Mortality Review report and the Root Analysis report arising from Client 1's death and enjoin Larue from further actions which deny IPAS the access authorized under both the PAIMI Act and Indiana statute.

**III.    Defendants violated the PAIMI Act by refusing to allow IPAS to have copies of the investigation and an incident report concerning the incidents in question and Client 2's grievance that arose out of those incidents.**

Client 2, who has the Larue Carter Patient Case #: 17127, was initially admitted to Larue Carter Hospital in November 2003. He was residing on Unit 3A in November of 2006. He continues to be a resident of Larue Carter Hospital. (Stip. ¶ 9, App. 2). As discussed in Argument, Section I, Larue is facility as defined by the PAIMI Act. Client 2 has a mental illness significant enough that he has been a resident at Larue since 2003. Client 2 requested services from IPAS, the eligible P&A system in Indiana, and as part of the intake process, he signed a "Request to Release Information" which allowed IPAS access to his records at Larue. (Owens Aff. ¶ 9, App. 5; Owens Aff. Attach. D, App. 12). Pursuant to 42 U.S.C.A. § 10802(4)(A) and (B)(i)(I), Client 2 meets the eligibility requirements for PAIMI services; and is an IPAS client. Pursuant to 42 U.S.C.A. 10805(a)(4)(A), IPAS shall have access to all records of "any individual who is a client of the system if such individual, or the legal guardian, conservator, or other legal

representative of such individual, has authorized the system to have such access." Client 2 does not have a guardian, conservator, or legal representative as defined by the PAIMI Act; and he has authorized IPAS to have access to his records at Larue.

On or about October 13, 2006, Owens requested by e-mail to Eric Heeter, Adult Services Division Director at Larue, a copy of the investigation and an incident report concerning the incidents in question and Client 2's grievance that arose out of those incidents.  Owens asked to be notified via e-mail by end of business day October 17, 2006.  (Stip. ¶ 10, App. 2-3; Owens Aff. ¶ 10, App. 5-6; Owens Aff. Attach. E and F, App. 13-17).  On or about October 13, 2006, Mr. Heeter explained in an e-mail that he could not provide a copy of the incident report "per organization policy".  (Owens Aff. ¶ 11, App. 6; Owens Aff. Attach. E, App. 13-14).  In a separate e-mail dated October 18, 2006, Mr. Heeter replied to Owens by e-mail explaining the sequence of events and Larue's response.  (Owens Aff. ¶ 12, App. 6; Owens Aff. Attach. F, App. 15-17).  On or about October 18, 2006, Owens also received an e-mail from Kellum stating that it was not appropriate to ask for a copy of the Incident Reports.  (Stip. ¶ 11, App. 3; Owens Aff. ¶ 13, App. 6; Owens Aff. Attach. F, App. 15-17).  Ms. Kellum stated "it is not appropriate at any time to ask for a copy of Incident Reports.  Those are internal documents only and are never to be copied or distributed."  (Owens Aff. ¶ 13, App. 6; Owens Aff. Attach. F, App. 15-17).

It appears from the e-mails from Mr. Heeter and Ms. Kellum that IPAS was denied access to or copies of the Incident Report because it is an internal document and an organizational policy forbids access to an internal document.  No other basis for the denial was forthcoming.

As stated earlier in this brief, pursuant to 42 U.S.C.A. § 10806(b)(3)(A), records are defined as follows:

> [T]he term "records" includes reports prepared by any staff of a facility rendering care and treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility that describe incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents, and discharge planning records.

Further , 42 C.F.R. § 51.41(c) provides:

> Information and individual records, whether written or in another medium, draft or final, including hand written notes, electronic files, photographs or video or audio tape records, which shall be available to the P&A system under the Act shall include, but not be limited to:
>
> …
>
> (1) Reports prepared by an agency charged with investigating abuse neglect, or injury occurring at a facility rendering care or treatment, or by or for the facility itself, that describe any or all of the following:
>
>> (i)   Abuse, neglect, or injury occurring at the facility;
>> (ii)  The steps taken to investigate the incidents;
>> (iii) Reports and records, including personnel records, prepared or maintained by the facility, in connection with such reports of incidents; or
>> (iv)  Supporting information that was relied upon in creating a report, including all information and records used or reviewed in preparing reports of abuse, neglect or injury such as records which describe persons who were interviewed, physical and documentary evidence that was reviewed, and the related investigative findings.

An Incident Report certainly qualifies as a report "prepared by any staff of a facility rendering care and treatment …that describe incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents…" 42 U.S.C.A. § 10806(b)(3)(A). An Incident Report also clearly qualifies as a report prepared by the facility itself, that describes abuse, neglect, or injury occurring at the facility and the steps taken to investigate the incidents as defined in 42 C.F.R. § 51.41(c).

The federal PAIMI statutes and supporting regulations preempts any organizational policy. Even if this policy is based on a State statute, "State law must not diminish the required authority of the Act." 42 C.F.R. § 51.31(h).

Once again Larue's denial of the Incident Report is clearly a violation of PAIMI's access authorization.  And once again, that action has interfered with IPAS's basic mandate to protect Indiana individuals with mental illness who may have been the subject of abuse or neglect. IPAS would ask that the Court order Larue to provide IPAS with the requested copies of Client 2's Incident Report and enjoin Larue from further actions which deny IPAS the access authorized under both the PAIMI Act and Indiana statute.

## CONCLUSIONS

There is no genuine issue of fact remaining.  The Stipulations and Affidavits with Attachments leave no dispute as to any material fact.  As discussed in this brief, Defendants have repeatedly ignored and violated applicable federal and state statutes and regulations.  Plaintiff is entitled to a favorable judgment as a matter of law.

Wherefore, Plaintiff, Indiana Protection and Advocacy Services respectfully requests that the Court find Defendants' actions a violation of the PAIMI Act, enter a judgment in favor of Plaintiff and against Defendants, order Defendants to provide access to and copies of the requested records, and enjoin Defendants from any further denial or withholding of any records, documents, etc. requested by IPAS pursuant to its authority granted under PAIMI Act, and for all other just and proper relief.

Respectfully Submitted:


/s/ Debra J. Dial
Debra J. Dial
Indiana Protection and Advocacy Services
4701 North Keystone Avenue
Suite 222
Indianapolis, Indiana  46205
(317) 722-5555 Ext. 230

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2007 a copy of the foregoing Brief in Support of

Plaintiff's Summary Judgment Motion was filed electronically.  Notice of this filing will be sent

to counsel below by operation of the Court's electronic filing system.  Parties may access this

filing through the Court's system.

Michael T. Schafer
Office of Michael T. Schafer
350 E. 60th Street
P.O. Box 20684
Indianapolis, Indiana  46204
(317) 255-6580

<u>/s/ Debra J. Dial</u>