UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| INDIANA PROTECTION )<br>AND ADVOCACY SERVICES, )<br>      Plaintiff, )<br>)<br>vs. )<br>)<br>INDIANA FAMILY AND SOCIAL SERVICES )<br>ADMINISTRATION, *et al.*, )<br>      Defendants. ) | 1:06-cv-1816-LJM-TAB |

**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

The parties in this cause, plaintiff, Indiana Protection and Advocacy Services ("IPAS"), and defendants, Indiana Family and Social Services Administration ("IFSSA"), Mitch Roob, in his official capacity as Secretary of the Family and Social Services Administration, Cathy Boggs, in her official capacity as Director of the Division of Mental Health and Addiction, Lisa K. Kellum ("Kellum"), in her official capacity as Superintendent of LaRue Memorial Hospital ("LaRue") (defendants, collectively, "Defendants"), have stipulated to many of the relevant facts and claim that the Court should enter judgment in their favor as a matter of law pursuant to Federal Rule of Civil Procedure 56 ("Rule 56").

For the reasons stated herein, the Court **GRANTS** summary judgment in favor of IPAS and **DENIES** summary judgment in favor of Defendants.

# I. BACKGROUND

The undisputed and stipulated facts are these:

## A. THE PARTIES

IPAS was established by the State of Indiana to administer and operate the Protection and Advocacy for Individuals with Mental Illness Act of 1986 (the "PAIMIA"), which was enacted to establish independent protection and advocacy ("P&A") systems nationwide. *See* Ind. Code § 12-28-1-1 *et seq.*; *see also* 42 U.S.C. §§ 10801(b)(2)(A) & (B). The PAIMIA gives IPAS the authority to protect and to advocate for the rights of individuals with mental illness "through activities to ensure the enforcement of the Constitution and Federal and State statutes" and by investigating "incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred." 42 U.S.C. §§ 10801(b)(2)(A) & (B).

Defendant LaRue is a state institution as defined by Indiana Code § 12-7-2-184 and is administered by the Indiana Division of Mental Health and Addiction ("DMA"). Ind. Code § 12-24-1-3. LaRue provides overnight care and treatment to individuals with mental illness.

Defendants represent the interests of two mentally ill patients, J.Y.G. ("Client 1"), who had LaRue patient case number 17455, and J.F. ("Client 2"), who had LaRue patient case number 17127. The specific involvement of each defendant in each patient case is described below.

## B.  STATUTORY FRAMEWORK

Congress expressly codified the purpose of the PAIMIA:

**(a)** The Congress finds that—

**(1)** individuals with mental illness are vulnerable to abuse and serious injury;

**(2)** family members of individuals with mental illness play a crucial role in being advocates for the rights of individuals with mental illness where the individuals are minors, the individuals are legally competent and choose to involve the family members, and the individuals are legally incompetent and the legal guardians, conservators, or other legal representatives are members of the family;

**(3)** individuals with mental illness are subject to neglect, including lack of treatment, adequate nutrition, clothing, health care, and adequate discharge planning; and

**(4)** State systems for monitoring compliance with respect to the rights of individuals with mental illness vary widely and are frequently inadequate.

**(b)** The purposes of this chapter are—

**(1)** to ensure that the rights of individuals with mental illness are protected; and

**(2)** to assist States to establish and operate a protection and advocacy system for individuals with mental illness which will—

**(A)** protect and advocate the rights of such individuals through activities to ensure the enforcement of the Constitution and Federal and State statutes; and

**(B)** investigate incidents of abuse and neglect of individuals with mental illness if the incidents are reported to the system or if there is probable cause to believe that the incidents occurred.

42 U.S.C. § 10801.

Along with the authority to investigate incidents of abuse and neglect of individuals with mental illness, the PAIMIA give IPAS the authority to access all records of—

> **(A)** any individual who is a client of the system if such individual, or the legal guardian, conservator, or other legal representative of such individual, has authorized the system to have such access;
>
> **(B)** any individual (including an individual who has died or whose whereabouts are unknown)—
>
>> **(I)** who by reason of the mental or physical condition of such individual is unable to authorize the system to have such access;
>>
>> **(ii)** who does not have a legal guardian, conservator, or other legal representative, or for whom the legal guardian is the State; and
>>
>> **(iii)** with respect to whom a complaint has been received by the system or with respect to whom as a result of monitoring or other activities (either of which result form a complaint or other evidence) there is probable cause to believe that such individual has been subject to abuse or neglect; and
>
> **(C)** any individual with a mental illness, who has a legal guardian, conservator, or other legal representative, with respect to whom a complaint has been received by the system or with respect to whom there is probable cause to believe the health or safety of the individual is in serious and immediate jeopardy, whenever—
>
>> **(I)** such representative has been contacted by such system upon receipt of the name and address of such representative;
>>
>> **(ii)** such system has offered assistance to such representative to resolve the situation; and
>>
>> **(iii)** such representative has failed or refused to act on behalf of the individual . . . .

42 U.S.C. § 10805(a)(1) & (4).

## C.  CLIENT 1

Client 1 was admitted to LaRue on June 21, 2006, and was admitted to Wishard Memorial Hospital ("Wishard") from LaRue on June 27, 2006.  Stip. ¶¶ 1-2.  On July 31, 2006, Client 1 died at Wishard.  *Id.* ¶ 3.

On or about July 31, 2006, IPAS received a report from a professional staff member employed by LaRue that Client 1 had expired.  Owens Aff. ¶ 2.

On August 11, 2006, a mortality review committee met at LaRue regarding Client 1's death and its report was transcribed on August 28, 2006.  Stip. ¶ 4.

On or about August 30, 2006, IPAS Advocacy Specialist, Peggy Ann Owens ("Owens"), requested a copy of Client 1's complete chart held at LaRue.  *Id.* ¶ 5.  Owens' request was made by letter to Jay Wenning ("Wenning"), Director of Health Information Services at LaRue.  *Id.*  The letter stated, in part, that if IPAS did not receive a copy of the chart or there was no response by September 11, 2006, IPAS would assume that LaRue did not intend to comply with the request.  *Id.  See also* Owens Aff. Ex. A.

Also on August 30, 2006, Owens reviewed Client 1's chart that was located at LaRue.  Owen Aff. ¶ 4.

On or about September 1, 2006, Kathy Gregory ("Gregory"), Deputy Chief Counsel for the DMA, notified IPAS that Client 1 had parents who had been active in her case and, as next of kin, had not signed a release of Client 1's medical records.  Stip. ¶ 6.  However, there is no record that prior to her death, Client 1 had a court-appointed guardian, power of attorney or health care representative.  *Id.*

On or about September 13, 2006, Owens sent a second letter to Wenning this time requesting a copy of the mortality review committee report and the root cause analysis report that were done after Client 1's death. *Id.* ¶ 7; Owens Aff. ¶ 6. This letter stated, in part, that if IPAS did not receive the requested reports or if there was no response by September 19, 2006, IPAS would assume that LaRue did not intend to comply with the letter. Owens Aff. Ex. C. Also on that date, Owens reviewed Client 1's chart that was located at LaRue. *Id.* ¶ 7.

On or about September 14, 2006, Gregory notified Owens at IPAS that IPAS could not receive copies of the requested reports concerning Client 1's death. Stip. ¶ 8.

### D.  CLIENT 2

Client 2 was initially admitted to LaRue in November 2003. Stip. ¶ 9. At the times relevant to this dispute Client 2 resided on Unit 3A at LaRue; Client 2 is still a resident of the hospital. Id.

Client 2 requested services from IPAS sometime in September 2006 concerning his treatment at LaRue. Owens Aff. Ex. D. As part of the intake process, Owens received a "Request to Release Information" form ("the release") that was signed by Client 2. *Id.* The release requested that LaRue release to Owens, or other representative of IPAS, any and all records pertaining to Client 2 for the purpose of advocacy. *Id.*

On or about October 13, 2006, by email to Eric Heeter ("Heeter"), Adult Services Division Director at LaRue, Owens requested a copy of the investigation of Client 2's consumer grievance and a copy of the incident report concerning a certain matter related to Client 2. Stip. ¶ 10; Owens Aff. Ex. E. In the email, Owens stated: "If you are unable to do this, please notify me via e-mail by the end of business on Tuesday 10/17/06." Owens Aff. Ex. E. On or about the same day, Heeter

responded that he could not provide an incident report "per organization policy." Owens Aff. Ex. E.

However, on or about October 18, 2006, via email, Heeter replied to Owens and explained the sequence of events and LaRue's response. Stip. ¶ 11. Also on or about that date, Owens received an email from Kellum, Superintendent at LaRue, stating that it was "not appropriate at any time to ask for a copy of the Incident Reports [sic]. Those are internal documents only and are never to be copied or distributed." Owens Aff. Ex. F.

## II. SUMMARY JUDGMENT STANDARD

To paraphrase the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee*, 916 F.2d 1261, 1267-68 (7th Cir. 1990). Motions for summary judgment are governed by Federal Rule of Civil Procedure 56 (c) ("Rule 56(c)"), which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving

party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). *See also Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Nat'l Athletic Sportswear*, 528 F.3d at 512. It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which it relies. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (stating that the non-movant must "'do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Waukesha Foundry, Inc. v. Indus. Eng'g, Inc.*, 91 F.3d 1002, 1007 (7th Cir. 1996))); *Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 610 (7th Cir. 2005).

In evaluating a motion for summary judgment, the Court draws all reasonable inferences from undisputed facts in favor of the nonmoving party and views the disputed evidence in the light most favorable to the nonmoving party. *See Springer*, 518 F.3d at 483-84; *Nat'l Athletic Sportswear*, 528 F.3d at 512. The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248; *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007); *Anders v. Waste Mgmt. of Wis.*, 463 F.3d 670, 675 (7th Cir. 2006).

### III.  DISCUSSION

#### A.  ISSUES REGARDING THE RECORDS OF CLIENT 1

In moving for summary judgment IPAS alleges that LaRue's denial of Owens' request for the records of Client 1 amounts to a failure by LaRue to provide IPAS with reasonable access to records in violation of the PAIMIA.  Defendants assert that the PAIMIA does not require them to give IPAS Client 1's records because IPAS failed to get consent of Client 1's parents.  In addition, Defendants contend that they were justified in not giving IPAS the peer review and root cause analysis documents regarding LaRue's investigation into Client 1's death because they were analytical investigation documents not covered by the PAIMIA, and because of confidentiality concerns.

The first issue is whether the PAIMIA requires Defendants to give copies of records maintained by IFSSA or LaRue about Client 1 to IPAS without Client 1's parents' consent.  The Court concludes that the relevant statute requires that IPAS be given the records after probable cause is found if the IPAS client does not have a court-appointed guardian, conservator or other legal guardian.

When approaching an issue of statutory interpretation like the one at issue here, the Court begins with the plain wording of the relevant statutory provision.  *See Gaffney v. Riverboat Servs. of Ind., Inc.*, 451 F.3d 424, 445 (7th Cir. 2006).  In doing so, the Court must "'assume that [a term's] plain meaning accurately expresses the legislative purpose.'"  *United States v. Misc. Firearms, Explosives, Destructive Devices & Ammunition*, 376 F.3d 709, 712 (7th Cir. 2004), *cert. denied sum nom.*, *Flischli v. United States*, 544 U.S. 1019 (2005), (quoting *Grzan v. Charter Hosp. of Nw. Ind.*, 104 F.3d 116, 122 (7th Cir. 1997)).  Moreover, in order to ascertain the plain meaning of a term, the

Court looks at "the specific language at issue, the context in which the language is used, and the broader context of the statute as a whole." *Id.* (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). The Court may "not construe a statute in a way that makes words or phrases meaningless, redundant or superfluous." *Id.* (citing *Welsh v. Boy Scouts of Am.*, 993 F.2d 1267, 1272 (7th Cir. 1993)).

The term "legal representative" is not defined by the PAIMIA; however, the term is defined in the Code of Federal Regulations:

> Legal Guardian, Conservator, and Legal Representative all mean an individual whose appointment is made and regularly reviewed by a State court or agency empowered under State law to appoint and review such officers, and having authority to consent to health/mental health care or treatment of an individual with mental illness. It does not include persons acting only as a representative payee, persons acting only to handle financial payments, attorneys or persons acting on behalf of an individual with mental illness only in individual legal matters, or officials responsible for the provision of health or mental health services to an individual with mental illness, or their designees.

42 C.F.R. § 51.2. Likewise, in its commentary to the final rule that appeared in the Federal Register on October 15, 1997, the U.S. Department of Health and Human Services (the "DH&HS") clarified this definition noting that "legal guardian for the purposes of this regulation is an individual who is appointed by the appropriate State powers to be a legal guardian for the individual and who has the authority to consent to health/mental health care or treatment for the individual with mental illness." Requirements Applicable to Prot. & Advocacy of Individuals with Mental Illness, 62 Fed. Reg. 53,548, 53,552 (Oct. 15, 1997) (to be codified at 42 C.F.R. pt. 51). With respect to minor children, the DH&HS stated that "natural or adoptive parents are legal guardians unless the State has appointed another legal guardian under applicable State law." *Id.* Giving full effect to the DH&HS' interpretation of the PAIMIA, then, would mean that, for adult children, the legal representative is

"an individual whose appointment is made and regularly reviewed by a State court or agency . . . ." 42 C.F.R. § 51.2.

In addition, although Congress explicitly recognizes the importance of the family to the protection of and advocacy for persons with mental illnesses in the PAIMIA, it expressly differentiated "legal guardian, conservator or legal representative" from a family member when describing the role of the family under the PAIMIA:

> [F]amily members of individuals with mental illness play a crucial role in being advocates for the rights of individuals with mental illness where the individuals are minors, the individuals are legally competent and choose to involve the family members, and the individuals are legally incompetent and the legal guardians, conservators, or other legal representatives are members of the family . . . .

42 U.S.C. § 10801(a)(2). In other words, Congress provides a role for the family as advocates of adult children who are legally competent only when the individual has chosen to involve them, and for adult children who are legally incompetent only when "the legal guardians, conservators, or other legal representatives are members of the family . . . ." In light of this language, a construction of the term "legal representative" to include the parents of adult children would eliminate Congress' intent to include a parent as an advocate of such individuals only when they have been appointed by the relevant state agency or court and are subject to ongoing oversight in some way. Such a construction does not obliterate the family as advocates for mentally ill adults; rather it confirms the role of the State agency, like IPAS, as an advocate for mentally ill adults in addition to the family.

The Court has construed the term "legal representative" to mean a State agency or court-appointed guardian, conservator or health care representative. The parties have stipulated that Client 1 had no such legal representative. Stip. ¶ 6. Therefore, pursuant to the terms of the PAIMIA, Defendants should have given copies of Client 1's records to IPAS.

Defendants contend that a construction that eliminates obtaining agreement from a parent to access a deceased mental patient's records is unconstitutional. Specifically, Defendants assert that it violates the requirement of notice and an opportunity to be heard under the Due Process Clause and/or it violates a parent's rights over their children as well as the parents' right to privacy. The Court fails to see the similarity between the situations in the cases cited by Defendants and the protection of mentally ill patients by a federally-mandated and state-created agency. The most similar case, *Stanley v. Illinois*, 405 U.S. 645 (1972), in which the Supreme Court found unconstitutional an Illinois statute that eliminated an unwed father from the definition of parent because it denied him a hearing, involved the definition of the term "parent." Clearly the term "parent" can include an unwed father. However, it is not equally clear that the term "legal representative" includes a parent in the context of the PAIMIA. Rather, the plain meaning of the term is something different than "parent," even in the context of the PAIMIA.

Likewise, the Court is unpersuaded by Defendants' argument that excluding consent of the parents under the PAIMIA violates the liberty interest of the parent to the "care, custody, and control of their children . . . ." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). In *Troxel* the Supreme Court addressed the rights of parents vis-a-vis minor children. There is nothing in the language of *Troxel* or similar cases that focuses on the rights of parents over adult children. In fact, individuals over the age of eighteen are adults, with the rights of adults. Mental illness or residency in a state facility for treatment for such illness does not take away those adult rights just because a parent is involved in the eighteen-year-old's life. Moreover, this is not a case where the statute gives broad power to IPAS to investigate any incident that occurs involving a mentally ill individual. Rather, the PAIMIA limits IPAS' role to situations where "there is probable cause to believe that such individual has been

12

subject to abuse or neglect . . . ." 42 U.S.C. § 10805(a)(1). This limitation ensures that IPAS is only allowed access to a patient's records in the most egregious of circumstances. The Court cannot see how the failure to notify or seek permission from an adult's parent would violate the parent's due process rights.

Finally, Defendants assert that IPAS has no authority under the PAIMIA to obtain access to the peer review committee report or the root cause analysis regarding Client 1. Specifically, Defendants argue that these documents are not "reports" or "records" as that term is defined by the PAIMIA. In addition, Defendants contend that even if they could be considered reports or records under the PAIMIA, the federal statute does not preempt Indiana state law, which renders peer review committee reports confidential and privileged. *See* Ind. Code § 34-30-15-1.

IPAS asserts that both peer review committee reports and root cause analyses are included in the documents to which PAIMIA grants IPAS access. IPAS also argues that nothing in Indiana Code § 34-30-15-1 prohibits Defendants from supplying the peer review committee report to IPAS because such disclosure is not a breach as that term is used in the statute. Moreover, IPAS asserts that even if Indiana Code § 34-30-15-1 could prohibit disclosure, the PAIMIA preempts that statute.

The plain meaning of "records" and the agency regulations implementing PAIMIA support IPAS' view that peer review committee reports and root cause analyses are included in that definition. The PAIMIA defines "report" to

> include[] reports prepared by any staff of a facility rendering care and treatment or reports prepared by an agency charged with investigating reports of incidents of abuse, neglect, and injury occurring at such facility that describe incidents of abuse, neglect, and injury occurring at such facility and the steps taken to investigate such incidents, and discharge planning records.

42 U.S.C. § 10803. According to the plain language of first phrase of this section, reports prepared to investigate incidents at a covered facility are included in the scope of documents to which IPAS should have access. In addition, the regulation that implements this statute specifically provides for IPAS' access to "investigative findings." 42 C.F.R. § 51.41(c)(1)(iv). It is clear that both peer review committee reports and root cause analyses are "investigative findings;" therefore, the term "record" would encompass both types of documents. As a result, the Court concludes that, under these provisions of PAIMIA, IPAS is entitled to access the peer review committee reports and the root cause analysis in Defendants' possession regarding Client 1.

The Court also concludes that, while Indiana Code § 34-30-15-1 does not prohibit Defendants from supplying the peer review committee report to IPAS, it does not mandate such disclosure. As such, it seems to be in conflict with the provision of the PAIMIA that a "system established under section 10803 of the Act shall have access to all records." 42 U.S.C. § 10805(a)(4). Specifically, Indiana Code § 34-30-15-1 states, in relevant part:

> (f)    Upon its determination, the governing body of a hospital may report, as part of the hospital's quality assessment and improvement program, a determination of a peer review committee of the hospital regarding an adverse event concerning patient care to the state department of health or another state agency without:
>
> (1)    violating this section; or
>
> (2)    waiving the confidentiality and privilege attached to the communications, proceedings, records, determinations, or deliberations of the peer review committee.

Ind. Code § 34-30-15-1. Thus, while IPAS is correct that the Indiana scheme allows for disclosure of peer review committee reports to a state agency like IPAS, the language of the statute is permissive, meaning a hospital could choose not to do so. In that case, IPAS contends that it has the

14

right to access these records or reports and, for that determination, the Court must turn to the language of the PAIMIA.

As stated above, the language of the PAIMIA concerning the ability of IPAS to access records of a mentally ill patient is mandatory. 42 U.S.C. § 10805(a)(4). Defendants' arguments that peer review reports are not "records" under the PAIMIA because of the language of 42 C.F.R. § 51.41(c), which provides examples of what is included in a "record" but states "except that nothing is this section is intended to preempt State law protecting records produced by medical care evaluation or peer review committees," have been rejected by the Second, Third, Eighth, and Tenth Circuit Courts of Appeals. *See Prot. & Advocacy for Persons with Disabilities v. Mental Health & Addiction Servs.*, 448 F.3d 119 (2d Cir. 2006); *Pa. Prot. & Advocacy, Inc. v. Houstoun*, 228 F.3d 423 (3d Cir. 2000); *Mo. Prot. & Advocacy Servs. v. Mo. Dep't of Mental Health*, 447 F.3d 1021 (8th Cir. 2006); *Ctr. for Legal Advocacy v. Hammons*, 323 F.3d 1262 (10th Cir. 2003). In essence, the Courts of Appeals have concluded that the language of the access provision of the PAIMIA is clear that a protection and advocacy service is entitled to obtain peer review reports, notwithstanding any contrary agency regulation. This Court adopts the reasoning of the Second Circuit on this issue as set forth in *Protection and Advocacy for Persons with Disabilities, Connecticut v. Mental Health and Addiction Services*, 448 F.3d at 125-28.

On the question of preemption, this Court concludes that the PAIMIA preempts Indiana's statute regulating access to peer review reports to the extent that it can be read to allow a hospital to determine whether or not to disclose the information after a legitimate request by IPAS. In other words, under the PAIMIA, disclosure of such records is not discretionary, it is mandatory in instances where the PAIMIA's disclosure provisions are triggered. As discussed above, Indiana

Code § 34-30-15-1 allows a hospital's governing body to make its own determination about whether or not to disclose peer review reports. This is in direct conflict with the language of the PAIMIA, which states that IPAS "shall have access to all records." 42 U.S.C. § 10805(a)(4). Congress has specifically spoken to the rights of IPAS to access records in the face of contrary state law:

> **(C)** If the laws of a State prohibit an eligible system from obtaining access to records of individuals with mental illness in accordance with section 10805(a)(4) of this title and this section, section 10805(a)(4) of this title and this section shall not apply to such system before—
>
> **(I)** the date such system is no longer subject to such a prohibition; or
>
> **(ii)** the expiration of the 2-year period beginning on May 23, 1986,
>
> whichever occurs first.

42 U.S.C. § 10805(a)(4). Therefore, the federal scheme applies regardless of the state law restricting access, and IPAS is entitled to obtain the peer review reports regarding Client 1.[1]

In summary, the Court has concluded that, in the context of the PAIMIA, the term "legal representative" does not automatically include the parent of an adult child; therefore, IPAS is entitled to obtain copies of Client 1's records from Defendants. In addition, the Court has concluded that IPAS is entitled to all records in Defendants' possession, including any peer review committee reports or root cause analyses that were done regarding Client 1.

---

[1] The Court notes that Defendants' concern that IPAS may not keep the peer review committee report confidential is without merit. The PAIMIA specifically requires IPAS to keep confidential the information it receives in connection with its duties under the PAIMIA, including from the patient. 42 U.S.C. § 10806(a). Moreover, no appeals process provided to the patient for wrongful withholding of the information would allow the individual to receive information like the peer review committee report to which he or she was not otherwise entitled. *See* 42 U.S.C. § 10806(b)(1); 42 C.F.R. §§ 164.524(a)(A)(3) & (4); Ind. Code § 16-39-2-4.

### B.  ISSUE REGARDING THE RECORDS OF CLIENT 2

Defendants had refused to provide IPAS with the incident reports regarding Client 2's complaint.  On page thirteen of their brief, Defendants concede that these types of reports are a "record" for purposes of the PAIMIA; therefore, summary judgment in favor of IPAS on this issue is appropriate.

### IV.  CONCLUSION

For the reasons stated herein, the Court **GRANTS** plaintiff's, Indiana Protection and Advocacy Services, Motion for Summary Judgment, and **DENIES** defendants', Indiana Family and Social Services Administration, Mitch Roob, in his official capacity as Secretary of the Family and Social Services Administration, Cathy Boggs, in her official capacity as Director of the Division of Mental Health and Addiction, Lisa K. Kellum, in her official capacity as Superintendent of LaRue Memorial Hospital, Motion for Summary Judgment.

IT IS SO ORDERED this 28th day of July, 2008.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

Electronically distributed to:

Debra Jean Dial
INDIANA PROTECTION AND ADVOCACY GROUP
djdial@ipas.IN.gov

Gary W. Ricks
INDIANA PROTECTION AND ADVOCACY SERVICES
gricks@ipas.IN.gov

Michael T. Schaefer
lawandgolf@indy.rr.com